OPINION OF THE COURT
Carol Berkman, J.
The defendant has been found to be unfit and both defense counsel and the People have moved to confirm that finding. The question is to whom should the court direct an order of commitment pursuant to CPL 730.50 (1) when the defendant is an incapacitated person as a result of mental defect rather than mental illness?
THE INSTANT CASE
Louis Santos is a 19-year-old man who, because of neglect, was removed from his natural mother’s care as a young child. He was placed in foster care, where he remained until about 18 months ago. At that time, he was progressing in a special school program for the mentally retarded. However, his foster parents were unable to cope with his need for more independence as he grew into adolescence and to provide him with adequate support and consistent structure. The situation in the foster home deteriorated and he ran away.
*64 Evaluations of the defendant conducted before he ran away showed that he was mentally retarded and required placement in a group home for mildly mentally retarded young persons with emotional/behavioral difficulties. However, despite the foster care agency’s promises to the defendant and their well-documented efforts to locate such a placement and to enlist the assistance of the Bureau of Child Welfare in doing so, no such placement was found.
The defendant lived on the streets, reportedly stealing food in order to eat. He was sodomized anally and developed syphilis. Periodically, he returned to his special school program, but refused placement in another foster home because he no longer trusted that he would be cared for properly.
In desperation, his social worker attempted to have him committed to the psychiatric inpatient unit of a city hospital, on an emergency basis, pursuant to Mental Hygiene Law § 9.39, as requiring a period of inpatient services as essential to his welfare and to remove him from the streets, where he presented a danger to himself, until a proper long-term placement could be found.[1] The records indicate that the admitting psychiatrist refused him admission because he was not psychotic.
Finally, despite the pleas of his social worker that the foster care agency be permitted to continue to try and work with the defendant, who was mentally retarded, the Family Court terminated his placement with the foster care agency, finding that since he was 18 years old and refused to cooperate in accepting a new foster home, further involvement of the foster care agency was not warranted.
Subsequently, the defendant was arrested on the two cases which are now before this court, the attempted robbery of an individual, where it is alleged he attempted to steal this person’s paycheck and in the process, hit him with a stick, and the assault of a police officer, where it is alleged he hit a transit *65 police officer who stopped him from entering the subway without paying the fare.
When he was brought before this court, it appeared that this defendant was mentally retarded. Accordingly, I appointed Hillel Bodek, M.S.W., C.S.W., a forensic clinical social worker who is the Director of the Developmentally Disabled Offender Project, as the court’s expert, to examine this defendant with regard to his current mental status in aid of disposition, pursuant to CPL 390.20 (3), and with regard to his competence to proceed. I also directed that the defendant undergo an examination of his competence to proceed by two qualified psychiatrists, as required by CPL article 730.
The reports of Mr. Bodek and of the two psychiatrists are in agreement that the defendant is suffering from mental retardation, as a result of which he lacks the present capacity to appreciate the proceedings against him and to assist counsel in his defense with a reasonable degree of rational understanding and that, therefore, he is an incapacitated person. None of the three examiners found any evidence of a severe mental illness although it is noted that the patient has emotional and behavioral difficulties.
Defense counsel and the People joined in moving to confirm the findings of Mr. Bodek and of the two psychiatrists. However, defense counsel raised a challenge to the statutory requirement that the defendant be committed, “to the commissioner of mental hygiene.” He argued that such a commitment was vague and failed to recognize the Legislature’s division of the Department of Mental Hygiene into separate offices for the care of the mentally ill and the developmentally disabled. He argued further that pursuant to such a vague order of commitment the defendant might well be placed inappropriately in a psychiatric center (i.e., Mid-Hudson Psychiatric Center) rather than in a developmental center, in violation of his rights to equal protection of law and to due process of law. Defense counsel argued that the court should commit the defendant specifically to the Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities. The People expressed agreement with defense counsel’s position.
STATUTORY FRAMEWORK
CPL article 730 provides for the commitment of incapacitated persons under final and temporary orders of observation, orders of commitment and orders of retention. The statute provides *66 that such orders commit the incapacitated person to, “the custody of the commissioner.” CPL 730.10 (3) defines the “commissioner,” as used in CPL article 730, as “the state commissioner of mental hygiene.” Article 730 was enacted in 1972 and is unchanged except for minor revisions not relevant to this case. However, the enactment of related statutes requires a reinterpretation of CPL 730.10 (3).
Effective April 1,1978, the Laws of 1977 (ch 978) divided the New York State Department of Mental Hygiene into three separate and autonomous offices, the Office of Mental Health (OMH), the Office of Mental Retardation and Developmental Disabilities (OMRDD) and the Office of Alcoholism and Substance Abuse Services. Each office has its own Commissioner. There is no longer a Commissioner of Mental Hygiene.
The Office of Mental Health (OMH) is charged with the care of those individuals who suffer from mental illness. Among other roles, OMH operates inpatient psychiatric hospitals, called psychiatric centers, as well as a variety of outpatient programs for the care and treatment of persons with mental illness. The mandate of OMH and the duties and responsibilities of the Commissioner of OMH are set forth fully in Mental Hygiene Law §§ 7.07 and 7.09, respectively.
The Office of Mental Retardation and Developmental Disabilities (OMRDD) is charged with the provision of habilitation[2] services to those persons who suffer from mental retardation and other developmental disabilities.[3] Among other roles, OMRDD operates State schools, also referred to as developmental centers, for the inpatient care and habilitation of mentally retarded individuals. The mandate of OMRDD and the duties and responsibilities of the Commissioner of OMRDD are set *67 forth fully in Mental Hygiene Law §§ 13.07 and 13.09, respectively.
The Commissioners of OMH and OMRDD have agreed that either the mental health or the developmental disabilities services sector shall assume primary responsibility for the care of dually diagnosed individuals (multiply handicapped persons who suffer from both a mental illness and from mental retardation/developmental disability), depending on the determination of each person’s primary diagnosis and need for services by a multiagency panel.
Similarly, when the Legislature revised the statutes relating to the defense of lack of criminal responsibility (Insanity Defense Reform Act of 1980, L 1980, ch 548), it recognized the distinction between mentally ill and mentally retarded individuals and between the Commissioners of the Office of Mental Health and of the Office of Mental Retardation and Developmental Disabilities.
Chapter 548 defines “commissioner” as, “the state commissioner of mental health or the state commissioner of mental retardation and developmental disability.” (CPL 330.20 [1] [a].) It recognizes the distinction between a, “defendant [who] currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant’s welfare”, and a mentally retarded defendant who, as a result of that disorder, “is in need of care and treatment as a resident in the inpatient services of a developmental center or other residential facility for the mentally retarded and developmentally disabled under the jurisdiction of the state office of mental retardation and developmental disabilities.” (CPL 330.20 [1] [d].)
Historically, the needs of the forensic population have been a responsibility of the mental health rather than the developmental disabilities services sector. Since 1980, however, the Office of Mental Retardation and Developmental Disabilities has taken several major steps to begin to address the unique needs of mentally retarded/developmentally disabled offenders.
OMRDD has developed a forensic component in its central office, under the direction of John Finn, who is the Forensic Services Specialist and Director of Special Populations for the agency. It has also promulgated regulations governing the provision of services to incapacitated defendants who are developmentally disabled and who are placed with OMRDD. (See, 14 NYCRR part 613.)
*68 In conjunction with the New York State Developmental Disabilities Planning Council, OMRDD provided initial funding and continues to provide support for the Developmentally Disabled Offender Project, directed and staffed by Hillel Bodek, M.S.W., C.S.W., a forensic clinical social worker. That project provides forensic evaluations and short-term treatment services to developmentally disabled and dually diagnosed offenders and provides consultation services regarding these offenders to criminal justice and human service agencies throughout New York State as well as training programs for judges, prosecutors, correctional personnel and others.
OMRDD operates a secure unit for the intensive treatment of behaviorally disordered, emotionally disturbed mentally retarded individuals, in Rochester. That unit, the Monroe Secure Unit for Intensive Treatment (Monroe SUIT), is the OMRDD analog of the OMH Mid-Hudson Psychiatric Center. Monroe SUIT, which has only 24 beds, is the only secure OMRDD facility for dealing with forensic clients.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A defendant who has been found not competent to proceed may be committed only for a reasonable period of time to determine whether he can be aided in attaining fitness to proceed in the foreseeable future. Moreover, the commitment may be only for the purpose of providing such a defendant with the mental health treatment and/or developmental disabilities habilitation services required for the defendant’s attainment of competence to proceed and must be justified by the defendant’s continued progress toward that goal. (See, Jackson v Indiana, 406 US 715 [1972].)
In this case, the defendant is not competent to proceed. His incapacity results from his mental retardation and resultant limitations in his intellectual, social and emotional development, but he does not suffer from a major mental illness for which psychiatric care and treatment are required. In other words, defendant needs the services of OMRDD, not OMH.
Mid-Hudson Psychiatric Center, a facility for the care and treatment of the mentally ill, has neither the special staff nor the special programs to address the needs of mentally retarded and developmentally disabled individuals. Those professionals and programs are located in OMRDD facilities.
The commitment of this defendant without specifying the specific agency would violate his rights to equal protection and due process in various ways.
*69 First, a person who requires the same services as defendant does, but who is not a criminal defendant, would be served properly in the developmental disabilities service sector rather than in the mental health sector. Therefore, the commitment of this defendant to the now nonexistent Commissioner of Mental Hygiene may lead to his placement in a psychiatric center, which would violate his right to equal protection of law.
Second, a civilly committed mentally disabled person must be specifically committed to the service delivery system, OMH or OMRDD, consistent with his particular clinical needs. Similarly, had this defendant been found not responsible by reason of mental defect, he would be committed to OMRDD, and not to OMH pursuant to CPL 330.20, for evaluation and for further habilitation/treatment. If the commitment of defendant lacks this same specificity, his right to equal protection of law would be violated.
Third, defendant’s commitment to any OMH facility would also violate his due process rights because it would subject him to commitment to a facility whose services would not be reasonably related to those he requires to facilitate his attainment of competence to proceed.
Fourth, due process requires that the defendant be provided with a reasonably specific notice of proceedings to commit him as an incapacitated person. Notice indicating that the defendant is to be committed to the nonexistent Commissioner of Mental Hygiene is insufficient and violates the defendant’s right to due process of law.
The limited bed capacity (24 beds) at the one secure forensic unit operated by OMRDD, as contrasted with the approximately 525 secure forensic beds available in the OMH system (at Mid-Hudson Psychiatric Center and at the Regional Forensic Units located at Manhattan, Gowanda, Rochester and Hutchings Psychiatric Centers), cannot justify such an inappropriate placement of an incapacitated defendant, in violation of his right to due process and to equal protection of law.
Accordingly, I hold that the provisions of CPL article 730 which relate to the “commissioner of mental hygiene” can only be interpreted and applied in a constitutionally acceptable manner if that term is defined as the Commissioner of OMH in relation to a person whose primary diagnosis is a mental illness and whose treatment needs are addressed properly in the mental health sector and as the Commissioner of OMRDD in relation to a person whose primary diagnosis is mental retardation *70 and/or developmental disability and whose habilitation/treatment needs are addressed properly in the mental retardation/developmental disabilities service sector. This incorporation by reference seems only sensible in view of the constitutional consequences enumerated above.
The defendant’s motion for an order directing that he be committed specifically to the Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities, under an order of commitment pursuant to CPL 730.50, is granted to the limited extent that the defendant will be committed to the Commissioner of OMRDD.
Should further clinical observation by OMRDD reveal that the defendant would be served more appropriately in an OMH facility, they may effect a transfer of treatment responsibility between OMRDD and OMH in accordance with the same procedures for transfer of primary care responsibility between them that they would employ in the case of a civil patient, as set forth in the interagency agreement they have entered into in relation to the provision of services to dual diagnosed clients, on notice to defense counsel, to the District Attorney of New York County and to the Mental Health Information Service at the facility where the defendant is located. Therefore, it is
Ordered that the above-captioned defendant is adjudicated to be an incapacitated defendant and is committed to the Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities for a period not to exceed one year from the date of this order, in accordance with the provisions of CPL 730.50. It is further
Ordered that the Commissioner of Correction of the City of New York continue to maintain the defendant in custody at the Bellevue Hospital Prison Ward pending a designation by the Commissioner of the Office of Mental Retardation and Developmental Disabilities of an appropriate OMRDD facility to which the defendant is to be admitted pursuant to this order and, upon receipt of such designation, shall promptly convey the defendant to said facility and surrender custody of the defendant to the OMRDD staff there. It is further
Ordered that should subsequent clinical observations by OMRDD reveal that in the opinion of their professional staff, the defendant’s needs would be best served in a psychiatric center, they may proceed to transfer the defendant to the care and custody of OMH, in accordance with the guidelines and procedures set forth in the OMRDD-OMH interagency agreement relating to the determination of primary care responsibility for *71 dual diagnosed clients, on notice to defense counsel, to the District Attorney of New York County and to the Mental Health Information Service at the OMRDD facility at which the defendant is located. It is further
Ordered that defense counsel serve a copy of this decision and order, by mail, on the Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities, on the Commissioner of the New York State Office of Mental Health and on the Office of Mental Health Bureau of Forensic Services and that he serve a copy of this decision and order, by personal service, upon the Commissioner of Correction of the City of New York, forthwith.

. Mental Hygiene Law § 9.39 provides for emergency commitment of individuals to a psychiatric hospital when such individuals, as a result of a mental disorder, present an imminent danger to themselves or to others. Mental Hygiene Law article 15, which refers to the commitment of mentally retarded individuals, does not provide for emergency commitment of a mentally retarded person to a developmental center. However, when a mentally retarded person requires an emergency period of inpatient care because he presents an imminent danger to himself or to others as a result of his mental disorder, he is committed pursuant to Mental Hygiene Law § 9.39. If it determined that he requires inpatient habilitation services, he is then referred to an OMRDD residential facility, after the emergency situation has been addressed in the local psychiatric facility.

. Habilitation services are those services which facilitate a person’s development of abilities and skills which they have not previously had. Unlike mental health treatment services, which address an illness, habilitation services address developmentally disabled persons’ needs to maximize their social, intellectual, emotional, cognitive and occupational development and potential.

. Developmental disabilities, unlike mental illness, are not disease entities, they are disorders of development where the normal developmental process is impaired significantly resulting in severe limitations in major areas of life functioning such as the development of the ability to communicate, the capacity for self-direction, self-care and for independent living, the ability to learn and to move around and the capacity for economic self-sufficiency.
i Mental retardation is one of the developmental disabilities. It refers to the presence of significantly subaverage intellectual functioning with concurrent deficits or impairments in adaptive behavior (everyday life functioning), the onset of which occurred during the developmental period (prior to age 18).